UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
LAS UVAS VALLEY DAIRIES,
a New Mexico General Partnership

    Debtor.                                            No. 17-12356-t11

METROPOLITAN LIFE INSURANCE
COMPANY,

    Plaintiff,

v.                                                        Adv. No. 18-01007-t

LAS UVAS VALLEY DAIRIES;
LITIGATION COMMITTEE OF
LAS UVAS VALLEY DAIRIES,

    Defendants,

and

LITIGATION COMMITTEE OF
LAS UVAS VALLEY DAIRIES

    Counter-Claimant

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

    Counter-Defendant.

## LITIGATION COMMITTEE'S REPLY REGARDING ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Counter-claimant the Litigation Committee established under the Liquidating Plan confirmed on June 14, 2018 (the "Committee"), by counsel, here replies to the Response (the "MetLife Response") [Doc 23] filed by MetLife to the Committee's Motion for Partial Summary Judgment (the "Committee Motion") [Doc 21]. In essence, although failing completely to

respond to several arguments made in the Committee Motion, the MetLife Response makes the same arguments MetLife made in its original Motion for Summary Judgment [Doc 22] and to which the Committee responded in its Response (the "Committee Response") [Doc 24].

## **INTRODUCTION**

It might be useful to step back and remember just what relief the Committee is seeking in its Motion for Partial Summary Judgment. MetLife argues, for example, that it is not clearly proven whether the permit numbers of the Pecan Farm water rights were listed in the MetLife list of permits attached to the Mortgage. Whether there are water rights owned by Las Uvas Valley Dairies not listed by permit number is an issue for proof if the Court concludes that the blanket claim for water rights in the Mortgage is inadequate but the listing by permit number adequately describes the water rights pledged. If the Court concludes either that a blanket description of the real estate is sufficient—and MetLife totally wins—or that the Change of Ownership Form ("COO Form") must be recorded—and the Committee totally wins—the issue of any particular water rights permit number is irrelevant. If the Court comes down in the middle, then whether any particular water right should have the lien avoided will be an issue for the proof. The Court need not address those specifics now.

In addition, the dispute on the facts regarding whether MetLife got 14 letters from the Office of the State Engineer (the "OSE") telling it to record the COO Form (which the Committee acknowledges is incorrect) or merely 9 letters telling it to do so does not seem to be dispositive. The fact is MetLife was told repeatedly–it admits 9 times—to record the COO Forms and did not do so.

This Reply will endeavor to avoid duplication and sort through the arguments to find the substantive issues.

2

**UNDISPUTED FACTS**

MetLife objects to certain facts and not others. Those not controverted with citation to the portions of the record relied on are deemed admitted. LR 7067-1(b). The Committee will respond to those facts that MetLife has attempted to controvert.

Fact No. 14. MetLife demies that it had a duty to attach to its Proof of Claim evidence of recordation of its COO Forms, but that is a legal argument which is flatly wrong. Claim 37 filed by MetLife represents in section 9 on page two, "Attached redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)" Despite that representation, MetLife failed to attach any COO Forms, recorded or otherwise. The Order entered February 12, 2018 [Doc 208] referenced in the Declaration of Paul M. Fish ("Decl. Fish") ordered MetLife to produce evidence that COO Forms had been filed with the county clerk. MetLife produced no such evidence for the vast bulk of the COO Forms produced.

Fact No. 16. MetLife asserts there is no evidence to support the fact that it did not record the COO Forms but then admits that it did not do so and argues it had no obligation to do so. The Fact is admitted.

Fact No. 17. MetLife disputes that it filed the COO Forms with the OSE as opposed to someone else filing them. The Committee admits that the fact should more properly have simply stated the COO Forms were filed with the OSE without identifying who did the filing. The Committee also admits that there were only 9 letters to MetLife telling it to record the COO Forms with the county clerk rather than 14 of them. MetLife asserts, "MetLife cannot confirm all letters were actually received when purportedly transmitted." However, MetLife does not dispute that all 9 were in its files and it produced the letters to the Committee when ordered by this

3

Court. As explained in the Committee Motion, p. 4, if MetLife has some alternative explanation of how the letters got in its files, it had the duty to present that evidence at this time. It has not done so.

Fact No. 18. MetLife admits the fact but then argues about its relevancy. The fact is admitted.

Fact No. 19. The objection to the Utton Declaration only identifies ¶ 16 as wrongful. Even if that paragraph is stricken, which it should not be, this Fact relates to the information in a COO Form and the concerns of purchasers as described in ¶ 8 of the Utton Declaration, which are clearly within Mr. Utton's expertise and are not instructing the Court on the law. If the Court does not strike the Utton Declaration in its entirety, this fact is admitted as uncontroverted.

Fact No. 21. The Committee agrees that the specific water rights sold with the Pecan Farm are not described in the MetLife Mortgage but then argues the "inference" of the fact. That is an issue that would be resolved when the Court rules on what needs to be recorded to perfect an interest in water rights. MetLife also does not submit any evidence regarding any COO Forms that the purchaser may have filed as part of the transaction.

Fact No. 22. This Fact is a negative statement that the COO Form of MetLife for the Pecan Farm water rights does not exist. MetLife had a duty to come forward to counter the negative by providing the COO Form, if such exists. In any event, the Fact is relevant to show the various possibilities that will be sorted out once the Court rules.

Fact No. 23. The objection to the Utton Declaration only identifies ¶ 16 as wrongful. Even if that paragraph is stricken, which it should not be, this Fact relates to the practice of a purchaser or mortgagee regarding filing COO Forms as described in ¶ 11 of the Utton Declaration. Those matters are clearly within Mr. Utton's expertise and are not instructing the

4

Court on the law. If the Court does not strike the Utton Declaration in its entirety, this fact is admitted as uncontroverted.

Fact No. 24. MetLife does not dispute the fact that it recorded three COO Forms with the county clerk. It merely argues the effect of those acts.

Fact No. 25. MetLife finally admits that it did not record all the COO Forms with the county clerk. The rest is merely argument.

Fact No. 26. This Fact asserts the general understanding of water law practitioners. It does not instruct the Court what the law is. If the Court does not strike ¶ 16 of the Utton Declaration, this fact is admitted as uncontroverted.

## THE UNCONTROVERTED UTTON DECLARATION SHOULD BE CONSIDERED

The Declaration of John W. Utton ("Utton Declaration") can be considered in connection with the Committee Motion because it presents admissible evidence. There are three prerequisites for the admission of expert testimony: (1) the expert must be qualified, (2) the specialized testimony must assist the trier of fact, and (3) the expert testimony must be limited to scientific, technical, or otherwise specialized knowledge in which the witness is qualified. *See generally* Fed.R.Evid. 702.

**a. Mr. Utton is qualified to express the opinions in the Declaration.**

John W. Utton ("Utton") is qualified as an expert of water law and his expertise is widely recognized by the New Mexico legal community. An individual is qualified to testify as an expert if he or she has "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Further, an "expert's testimony must be grounded in an accepted body of learning or experience in expert's field." Fed. R. Evid. 702 advisory committee's note to 2000 Amendments. Utton is an attorney with 23 years of specialized experience in water law. Utton Declaration at ¶¶ 5-6. He is

5

certified by the New Mexico Board of Legal Specialization as a Specialist in Natural Resources-Water Law and he has served as an adjunct faculty member at the University of New Mexico School of Law where he taught in advanced water law and natural resources writing. *Id*. at ¶ 5.

Utton's specialized knowledge and experience is trusted by his numerous public and private water clients across the state. *Id*. ("His public water clients include Santa Fe County, Dona Ana County, New Mexico State University, the City of Raton, the Camino Real Regional Utility Authority, Fort Sumner Irrigation District, Public Service Company of New Mexico, the New Mexico Interstate Stream Commission, and the State of New Mexico"). Further, Utton's specialized knowledge of water law has provided him opportunities on a national stage, as he currently represents NMSU as an amicus party in the pending *Texas v. New Mexico* compact litigation before the U.S. Supreme Court. *Id*. The breadth of Utton's specialized knowledge of water law is further exemplified by his CV. *See id*. at ¶¶ 5-6.

MetLife's attempt to discredit Utton's expertise on the basis that this dispute involves a specific issue within the field of water law is without merit. MetLife contends that Utton is not an expert specifically on securing an interest in the water rights being pledged by a mortgage and thus he does not qualify as an expert in this case. *See* MetLife Response at 6. As a water law expert, the breadth of Utton's expertise encompasses specific issues and subcategories within the field of water law including water rights issues. Utton Declaration at ¶ 5 (citing his law practice areas as: Water Rights, Water Litigation, and State Engineer Permitting and Water Planning). Rule 702 requires that an individual have specialized knowledge of the field for which his or her testimony is offered. *See* Fed. R. Evid. 702. As Utton is a recognized expert in the field of water law and practices in the area of water rights, he is qualified to testify with regard to water rights industry standards.

6

MetLife objects to the qualifications of Mr. Utton as only extensive experience representing purchasers and sellers of water rights as well as extensive speaking experience on the subject. It objects that Mr. Utton is not an expert on "mortgage lending." However, the issue in this case is not "mortgage lending." The issue is the perfection of a lien on water rights, not the applicable interest rate or repayment terms a lender would demand or the other matters on which an expert on "mortgage lending" would opine. It appears that MetLife is arguing that a purchaser of water rights would have no interest or concern regarding liens on the water rights, so Mr. Utton as the purchaser's lawyer would not have any knowledge or experience of liens on water rights. That is, unfortunately, the same argument MetLife makes on the merits. Quite the contrary, any purchaser represented by Mr. Utton would be very upset if he learned that his attorney did not determine that there was a $20 million mortgage on the water rights he was purchasing. That is part and parcel of representation of the purchaser. Mr. Utton is well qualified to express the opinions he does.

**b. The testimony will assist the trier of fact.**

In conformity with Rule 702, the Utton Declaration will assist the trier of fact. As noted by the Federal Rules of Evidence Advisory Committee:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (quoting Fed. R. Evid. 702 advisory committee's note to 1972 Proposed Rules).

Although the presentation of, e.g., testimony of an expert on bankruptcy law would not be of value to this Court, water law is something with which this Court rarely deals. Water law is

7

recognized as a highly specialized field, and expert testimony has been deemed helpful to the trier of fact when resolving water rights issues. *See Ellsworth v. Tuttle*, 148 Fed.Appx. 653, 661-62 (10th Cir. 2005) (upholding the district court's determination that a water law lawyer's testimony was admissible because his "specialized training, experience, and knowledge in the field of Utah water rights would help the jury understand the factual data contained in the [certificates of appropriation]"). In *Ellsworth*, the District Court held that a water law lawyer and the Assistant Regional Engineer were permitted to testify as expert witnesses, because "testimony that only constitutes the witness' personal experience relating to relevant subject matter is not impermissible." *Ellsworth v. Tuttle*, No. 2:01CV907K, 2003 WL 25658595, at *11 (D. Utah Mar. 21, 2003). The District Court further held that the experts "may properly synthesize the information relevant to each water right [because] [a] summary by the experts [would] be helpful to the trier of fact." *Id*. The Tenth Circuit upheld the District Court's determination and noted that expert testimony as to the sufficiency and validity of water rights at issue was properly admitted. *Ellsworth*, 148 Fed.Appx. at 662. As Utton is a water law lawyer with specialized knowledge, his testimony will similarly assist the trier of fact and is therefore admissible.

There are several separate matters discussed by Mr. Utton. His qualifications are set out in paragraphs 1 through 4. Paragraphs 5 through 12 discuss the practices of water law professionals regarding the COO Forms and the reliance by professionals in the area on the filings with the county clerks.[1] The Utton Declaration briefly addresses in paragraphs 12 through 15 the surface water regulation raised earlier but has not been raised in this briefing so those paragraphs are irrelevant. Only paragraphs 7 and 16 are cited by MetLife as "instructing" the

---

[1] The MetLife Response, p. 5, objects to the conclusions the Committee draws from paragraph 7 of the Utton Declaration, not to the actual Utton Declaration itself.

8

court on the law. If the Court decides paragraph 7 or 16 is inadmissible, the Court should still receive and consider the balance of the Utton Declaration

First, MetLife argues that "[t]he [Utton] declaration specifically states how 'to comply with the statute' (§72-1-2.1 NMSA 1978) in New Mexico." MetLife Response at 5 (internal citation omitted). MetLife strategically omitted the entirety of this portion's language in the Utton Declaration. Paragraph 16 does not instruct the Court on the law. It states the general understanding of water law practitioners:

> 16. In my opinion, it is generally understood among water law practitioners in New Mexico that COO Forms should be filed with the OSE and recorded with the county clerk in order to comply with the statute regarding securing an interest in the water rights being pledged by a mortgage.

Utton is not prescribing what must be done in order to comply with the statute. Instead, he is merely offering what is generally understood among water law practitioners in the industry. The testimony in paragraph 16 falls within the scope of permissible expert testimony. Although Utton's testimony may embrace the ultimate issue to be decided by the trier of fact, his testimony is nonetheless admissible as it "assists, rather than supplants, the jury's judgment." *See id.* ("[E]ven testimony which embraces an ultimate issue to be decided by the trier of fact is allowed under the Federal Rules of Evidence, so long as the expert's testimony assists, rather than supplants, the jury's judgment."); Fed. R. Evid. 704(a).

Second, MetLife contends that the Committee Motion's language, noting that the statute "is generally understood to control the conveyance of water rights whether it is a transfer by deed or conveyance by mortgage," attempts to define law. MetLife Response at 5. Again, MetLife misrepresents the information offered by the Utton Declaration. Utton does not state that this

9

statute controls the conveyance of water rights. Rather, Utton explains that it is generally understood in the industry that this statute is controlling.

MetLife relies heavily on *Specht* to support its claim that the Utton Declaration is inadmissible because it is being offered to define the law. *See* Response to Motion at 5. However, MetLife mischaracterizes the scope of the Utton Declaration. In *Specht*, the expert witness's testimony was deemed inadmissible because it contained an array of legal conclusions including that "warrantless searches are unlawful" and "that [the] defendants committed a warrantless search on plaintiff's property." *Specht*, 853 F.2d at 808. However, the Tenth Circuit Court of Appeals emphasized that it "do[es] not exclude all testimony regarding legal issues." *Id.* at 809. Instead it upheld that "a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Id.*

As examples, the *Specht* court provided additional cases which upheld expert testimony as admissible despite references to the law. *Id.* (citing *United States v. Buchanan*, 787 F.2d 477, 483 (10th Cir. 1986) (holding an expert's testimony regarding whether a certain weapon had to be registered with the Bureau of Alcohol, Tobacco, and Firearms, was admissible); *Huddleston v Herman & MacLean* 640 F.2d 534, 552 (5th Cir. 1981), *modified on other grounds*, 459 U.S. 357, 103 S.Ct. 863, 74 L.Ed.2d 548 (1983) (attorney expert in securities law allowed to testify that a statement in a prospectus was standard language for the issuance of a new security, because this information helped the jury weigh the evidence of the defendant's scienter); *United States v. Garber*, 607 F.2d 92 (5th Cir. 1979) (trial court erred in refusing to let experts on income tax law testify regarding whether failure to report funds received for sale of blood plasma constituted tax evasion)).

Additionally, in *MCC Management of Naples, Inc. v. Int'l Bancshares Corp.*, 468 Fed. Appx. 816, 821-22 (10th Cir. 2012), the Tenth Circuit allowed a tax attorney to testify as an expert about various interpretations of an underlying agreement in dispute because he was *merely* discussing "common methodology" that tax lawyers use in the industry. The court reasoned that the expert's testimony was admissible because the expert referred to the law but did not tell the jury how to apply it. *Id*. Further, the court found that the witness's testimony was helpful to the lay juror because "intricate arrangements and technical tax jargon were illuminated by [the witness's] experience . . . and knowledge of industry custom, tax law, and authorities in the field." *Id* at 822.

Utton's expert testimony is about water rights industry standards and customs. It is being offered to benefit the untrained layman or non-water rights lawyer so that he or she may be qualified to determine intelligently and to the best possible degree the complex water rights issues involved in this dispute. His testimony does not provide legal conclusions, define the law, or direct the verdict. Those privileges are reserved for the Court. Thus, as the Utton Declaration assists the trier of fact but does not supplant its judgment, his declaration satisfies the second requirement for the admission of expert testimony.

   **c. Mr. Utton's testimony is limited to the matters within his expertise.**

Finally, the Utton Declaration exclusively addresses the field in which Utton has specialized knowledge and is qualified. Utton's declaration addresses water rights industry standards and customs, and that falls within Utton's expertise in the field of water law.

Accordingly, as all of the prerequisites for admission of expert testimony are met, John W. Utton is qualified to testify as an expert and his testimony is properly considered in connection with the Committee's Motion for Summary Judgment.

# ANALYSIS

The analysis provided in the MetLife Response is for the most part a re-hash of the arguments made in MetLife's Motion for Summary Judgment. The Committee incorporates here its Response to MetLife's Motion for Summary Judgment and will attempt to avoid duplication. MetLife begins the analysis section discussing the loan by MetLife. As is the case in every §544 avoidance action, the Court is not being asked to determine whether a party was in bad faith or committed an unfair or wrongful act. The Bankruptcy Code respects a properly perfected security interest, but an unperfected lien is to be set aside for the benefit of the unsecured creditors. The issue is not whether MetLife and the Debtor intended to create a lien or whether they actually created a lien on the subject property. The issue is whether there is a properly perfected lien. Because the MetLife lien on water rights was not properly perfected, the lien must be set aside for the benefit of all unsecured creditors.

### a. The Issue Is Not Whether a Lien was Created. It Is Whether the Lien Was Perfected.

MetLife argues in its first point that there was a lien created in its favor on the water rights. That misses the point. The issue is not whether the lien was created. The issue is whether the lien was perfected. MteLife argues that § 72-1-2.1 NMSA 1978 and the COO Form "have nothing to do with the creation of a lien." MetLife Response, p. 8. That statement demonstrates the fallacy in MetLife's entire argument.

MetLife conflates the "creation of the lien" with the "perfection of the lien." The issue is not the "creation of a lien." The issue is the perfection of that lien. In order to give "Constructive Notice" (quoting the title of the statute) of "any other type of conveyance, affecting the title to a water right," the party must record the COO Form with the county clerk to give "constructive notice" of that interest. The Legislature would be well aware that the term "conveyance"

12

includes the filing of a lien. Under the Fraudulent Conveyance statute that was in effect until shortly before enactment of § 72-1-2.1, the term "conveyance" was defined as "every payment of money, . . . mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance;" § 56-10-1 NMSA 1978 (1986 Repl.).

Without the filing of the COO Form with the county clerk, a lien created will be binding on the parties and on those with actual knowledge of the transaction. It will not be binding on a bona fide purchaser for value without notice or others in the categories set forth in § 544 of the Bankruptcy Code. That is the whole point of this adversary proceeding.

### 1. *The Mortgage created a lien which affected the title to the water rights.*

The MetLife Mortgage created, but did not perfect, the lien on the water rights. As the Court knows, perfection of a lien requires constructive notice. A bona fide purchaser for value takes free and clear of liens of which it does not have constructive notice. The trustee in a bankruptcy—and in this case the unsecured creditors—stands in the shoes of a bona fide purchaser for value to avoid a lien of which the public does not have constructive notice. Importantly, the statute's title specifies that it provides the mechanism for "constructive notice" and the body of the statute states, "The filing shall be **public notice** of the existence and contents of the instruments so recorded from the time of recording with the county clerk." § 72-1-2.1 NMSA 1978 (emphasis added).

It bears repeating that, as admitted in the MetLife's Motion p. 9, Black's Law Dictionary defines a lien as "A legal right or interest that a creditor has in another's property." The intent of the statute was to give public notice of that legal right or interest in the water right being investigated.

MetLife relied on a section of the Restatement (Third) of Property (Mortgages) but neglected to refer to the very first section of that Restatement. In the very first section on mortgages, the Restatement (Third) of Property (Mortgages) sets out the essential nature of a mortgage, stating, "A mortgage is a conveyance or retention of an interest in real property as security . . ." *Id* at § 1.1. One court explained the nature of a lien by stating:

> A lien has been characterized in this jurisdiction as an obligation, tie, duty, or claim annexed to or attaching upon property by the common law, equity, contract, or statute. An encumbrance upon property as security for the payment of a debt, a lien is perhaps most accurately described as a right afforded by law to have an obligation satisfied out of particular property, thereby providing a supplemental remedy for the collection of a debt.

*Dupuy v. Western State Bank,* 375 N.W.2d 909, 912 (Neb. 1985) (citations omitted). A conveyance, retention, obligation, tie, duty, claim, encumbrance, or attachment to real property plainly affects the title of the property. Indeed, these are the exact things that a "title" insurance company would look for when determining whether to issue a "title" policy.

MetLife argues that the nine letters it received from the OSE instructing it to record the COO Form with the county clerk "don't affect the liens already obtained by MetLife." MetLife Response p. 11. Again, MetLife conflates the creation of the lien with the perfection of the lien. The failure to record the COO Form means that the lien created in the Mortgage exists and is binding on those with actual knowledge, but it is unperfected and subject to avoidance.

The creation of a lien affects title to the property pledged.

### 2. *The Mortgage did not adequately describe the water rights.*

MetLife repeats its argument that the Mortgage adequately described the water rights. However, the Legislature differs with MetLife. It decreed that to give "constructive notice" as stated in the title or "public notice" as stated in the body of the statute, one must record the COO Form with the county clerk.

14

A quick review of the Mortgage demonstrates why. First, any water right appurtenant to the real property described in the Mortgage can be severed and moved to a different location. A purchaser of the water right from its new location would not know of the Mortgage on the prior location without a search of the history of the water right and an examination of the title to each and every prior location. The Legislature decreed the purchaser need not do that. The mere listing of the permit number in an attachment to the Mortgage is also insufficient. Again, one only would look at that list if one knew the water right in question had been used on that property. Otherwise, that list simply does not give notice of the existence of the water right, or at least so decreed the Legislature. A COO Form is a specific filing that gives far better notice and has been decreed to be the method of giving "constructive notice" to the "public" of the existence of the conveyance of an interest affecting the title to the water right.

It cannot be disputed that the Legislature decreed that if a deed contained the description in the MetLife Mortgage, that description would not be "constructive notice." A COO Form with the details in that document is required for "public notice" of the "conveyance." The same logic applies to a mortgage. *Komadina v. Edmondson*, 468 P.2d 632, 634 81 N.M. 467, 469 (N.M. 1970).

In this case, there are water rights for which the permit number is not listed in the MetLife Mortgage. If the Court accepts the argument that the listing of the permit number is sufficient, partial summary judgment in favor of the Litigation Committee should enter for any water rights whose permit numbers are not listed in the Mortgage.

As explained in the Utton Declaration, and listed in Undisputed Material Fact 19 in the Committee's Motion, merely listing the permit number is insufficient and fails to disclose many

facts regarding the water right which are important for purposes of identification. The description of the water rights fails to qualify as "adequate" for purposes of perfection.

## CONCLUSION

As explained in the Utton Declaration, water rights transactions occur based on the presence or absence of a COO Form recorded with the county clerk. If that recordation is unnecessary to perfect a lien, then the COO Form recordation process is nothing more or less than a trap for the unwary. Reliance on the statutorily mandated procedure may result in the purchase of a water right whose title is not free and clear. That purchased water right may be subject, as in this case, to a claim of a multi-million dollar mortgage of which the purchaser had no notice, constructive or actual. The Legislature adopted the statute, professionals in this field rely on it, and it should be enforced.

WHEREFORE, the Court should deny MetLife's Motion for Summary Judgment, grant the Litigation Committee's Motion for Partial Summary Judgment, and set a trial on the value of the water rights.

Respectfully Submitted,

MODRALL, SPERLING, ROEHL, HARRIS
 & SISK, P.A.

By: */s/ Paul M. Fish*
 Paul M. Fish
 Spencer L. Edelman
 P.O. Box 2168
 500 Fourth Street NW, Suite 1000
 Albuquerque, New Mexico 87103-2168
 Tel: (505) 848-1800
 *Attorneys for Litigation Committee*

16

In accordance with NM LBR 9036-1 and
Fed. R. Civ. P. 5(b)(2)(D), this certifies that
service of the foregoing document was made
this 10th day of August, 2018, via the
notice transmission facilities of the case
management and electronic filing system
of the Bankruptcy Court.

By: ___*/s/ Paul M. Fish*___
      Paul M. Fish

*W3241452.docx*